672 A.2d 673

**Marcia CHALKWATER**

v.

**Wanda S. DOLLY, Personal Representative of the Estate of Henrietta Ponton Stegmaier, et al.**

**No. 978, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

March 4, 1996.

540

Stephen C. Wilkinson, Cumberland, MD, for Appellant.

H. Gregory Skidmore, Cumberland, MD (Linda M. Thomas and Skidmore, Alderson & Thomas, on the brief), for appellee, Dolly.

Timothy J. Connors, Shaker Heights, Ohio (John J. McMullen and Geppert, Paye, McMullen & Getty, P.C., on the brief) Cumberland, MD, for appellee, Diaz.

Argued Before WILNER, C.J., and HARRELL and EYLER, JJ.

WILNER, Chief Judge.

When Henrietta Stegmaier died on November 19, 1993, she owned 2,381 shares of stock in First Financial Corporation of Western Maryland along with options to purchase an additional 2,070 shares at $10/share.  Her Will, dated April 6, 1993, contained the following bequest:

> "The following shares of common stock of First Financial Corporation of Western Maryland:
>
> (i)  Two Thousand Shares (2,000) to Rosemary Diaz;
>
> (ii)  One Thousand Shares (1,000) to Wanda Dolly;

(iii) Four Hundred Fifty Shares (450) to Barbara Nies, for her friendship to me and the dogs."

The Will did not mention the stock options, which Ms. Stegmaier did not exercise prior to her death. Marcia Chalkwater, appellant, was named as the residuary legatee. Ms. Dolly was named as personal representative.

It is evident from the above that, although Ms. Stegmaier bequeathed 3,450 shares of the stock, she owned only 2,381 shares when she signed the Will and when she died. This situation changed when, on November 30, 1993, First Financial distributed a three-for-two stock split to stockholders of record as of November 10, 1993. As a result of that split, Ms. Stegmaier's 2,381 shares became 3,571 shares and her options for 2,070 shares became options to purchase 3,105 shares.

The Will was admitted to probate in the Orphans' Court for Allegany County. In the initial Inventory filed in February, 1994, Ms. Dolly included the entire 3,571 shares then in the estate but omitted to include any of the options. This was corrected by a revised Inventory filed on December 1, 1994. That Inventory (1) listed only the original 2,381 shares, (2) added the 2,070 original options, valued at the closing price of the stock of 27⅝, less the $10 option price, and (3) called attention to the stock split and the corresponding increase to 3,571 shares and 3,105 options, respectively.

In her administration account, filed March 3, 1995, Ms. Dolly:

(1) accounted for the original shares and options at the values set forth in the revised Inventory and the additional shares and options received through the stock split, at no value;

(2) claimed an expense of $20,710 for the cost of exercising the 3,105 options (with the stock split, the exercise price dropped from $10 to $6.67/share); and

(3) treated the estate as owning a total of 6,676 shares and proposed the following distribution of those shares:

(i) To Rosemary Diaz—3,000 shares;

(ii)  To Wanda Dolly—1,500 shares;

(iii)  To Barbara Nies—675 shares;  and

(iv)  To Residuary (Ms. Chalkwater)—1,501 shares.

The effect of these provisions was to give Ms. Diaz, Ms. Dolly, and Ms. Nies the benefit of the stock split and to charge the residuary estate with the cost of exercising the 3,105 options, 1,604 of which were necessary to provide the full distribution to the three named legatees.

Ms. Chalkwater filed exceptions to the account, contending, among other things that (1) the options were part of the residuary estate and that their exercise was unnecessary and (2) the three stock legatees should receive only the number of shares stated in the Will and that any additional shares obtained as the result of the stock split (or through exercise of the options) belong to the residuary estate. After a hearing, the exceptions were denied and the account was approved. This appeal ensued. As in the Orphans' Court, appellant claims that the general assets of the estate should not have been used to exercise the options and that the stock legatees should receive no more than the number of shares listed in the Will.

## DISCUSSION

### (1) Specific, General, and Demonstrative Legacies

Appellant treats both issues—the exercise of the options and the distribution of the stock—as governed by whether the bequests of the stock are to be regarded as specific, demonstrative, or general legacies. These categories are recognized both by statute (*see* Md.Code Est. & Tr. art., § 9–103) and in the case law.

In *England, Ex'r v. Vestry of P. George's Par.*, 53 Md. 466, 468–69 (1880), the Court, quoting from 1 *Roper on Legacies*, 190, defined a specific legacy as "the bequest of a particular thing, or money, specified and distinguished from all others of the same kind, as of a horse, a piece of plate, money in a purse, stock in the public funds, a security for money,

which would immediately vest with the assent of the executor." That definition remains standard. *See Bristol v. Stump,* 136 Md. 236, 110 A. 470 (1920); *Shamberger v. Dessel,* 240 Md. 650, 215 A.2d 177 (1965). To constitute a specific bequest, there must be "a segregation of the particular property bequeathed from the mass of the estate, and a specific gift of a specified portion to the legatee." *Miller v. Weber,* 126 Md. 658, 663, 95 A. 962 (1915), quoting *Mayo v. Bland,* 4 Md.Ch. 484, 487 (1852).

A general legacy, on the other hand, "is one which is payable out of the general assets of the estate of the testator, being a bequest of money or other thing in quantity, and not separated or distinguished from others of the same kind." *Shamberger, supra,* 240 Md. at 654–55, 215 A.2d 177. A demonstrative legacy, sometimes regarded as a third type, sometimes considered as a subcategory of general legacies, has been characterized as follows:

> "Demonstrative legacies partake of the characteristics of both general and specific ones. They are general in nature, but a certain fund or piece of property is pointed out as being primarily charged with their payment. The fund or piece of property (subject, of course, under certain circumstances to possible indebtedness, etc., of the testator) is primarily liable for their payment, but, due to their 'general' nature, if the fund or piece of property proves insufficient to pay them, the legatee may receive payment out of the general assets of the estate."

*Shamberger,* at 655, 215 A.2d 177; *see also Kunkel v. Macgill,* 56 Md. 120, 122 (1881) and *Gardner v. McNeal,* 117 Md. 27, 35, 82 A. 988 (1911), defining a demonstrative legacy as "in the nature of a general legacy, with a certain fund pointed out for its payment."

Which category a bequest falls into is determined ultimately by the testator's intent, and there are a number of principles that have been applied to guide the court in ascertaining that intent. Those principles derive, at least in part, from the different consequences that may flow from the result.

Specific bequests have at least three advantages, but one major disadvantage. The advantages are that (1) they abate last, (2) they are not liable for contribution to pay debts of the estate, and (3) the legatee is entitled to income and increments from the gifted property, accruing from the death of the testator. *Shamberger, supra,* 240 Md. at 656, 215 A.2d 177; *Dryden v. Owings,* 49 Md. 356 (1878); *Bristol, supra,* 136 Md. 236, 110 A. 470. The disadvantage is that, if the testator disposes of the item prior to his death or it is otherwise lost or destroyed, the legacy fails; it may not be paid out of general estate assets. *Dryden, supra,* 49 Md. 356; *Kunkel, supra,* 56 Md. 120; *Bristol, supra,* 136 Md. 236, 110 A. 470. Conversely, a general bequest abates ahead of specific legacies (Md.Code Est. & Tr. art. § 9–103), but, because it does not depend on the existence of specific property, it does not fail merely because any particular property mentioned no longer exists or proves insufficient. The personal representative must then apply other estate assets to the payment of the legacy.

A demonstrative legacy shares the advantage of a specific legacy in abating last (Est. & Tr. art., § 9–103), but in other respects it is treated like a general one. It does not fail merely because the property identified for its payment ceases to exist or proves insufficient; in that event, the legacy is paid from other estate assets.

■ These characteristics have long led the courts to prefer to construe a bequest as general, or demonstrative, rather than specific. Such a construction not only avoids the harshness of failure where the specified property no longer exists but provides more flexibility in the use of estate assets to satisfy debts and other legacies. In *Dryden, supra,* 49 Md. at 364, the Court noted:

"In determining this, as well as all other questions involving the construction of a will, it is admitted that the intention of the testator must prevail; but inasmuch as specific legatees are not liable to contribution in case of a deficiency in assets, and inasmuch as the legacy fails entirely if the testator parts with the property or thing specifically be-

queathed, *courts lean against construing a legacy to be specific, and have gone so far as to say that in no case ought a will to be so construed, unless the language imperatively requires it.* And accordingly we find Lord Eldon saying that according to well settled rules of construction, he was obliged to decide a legacy to be general, although according to his private opinion, the testator meant it to be specific."

(Emphasis added.)

Although later cases cast doubt on whether this rule of construction is as firm as Lord Eldon viewed it, the principle has been restated that bequests will not be regarded as specific "unless the language imperatively requires it." *Gardner, supra,* 117 Md. at 34, 82 A. 988; *Bristol, supra,* 136 Md. at 239, 110 A. 470.

### (2) Stock Split

It is clear in Maryland, by statute, that if a bequest of stock is found to be a specific legacy and, by reason of corporate changes the number of shares comprising the bequest is increased, the legatee gets the additional shares. Md.Code Est. & Tr. art., § 4–405.[1] There is no statutory direction, one way or the other, with respect to general and demonstrative legacies. In light of § 4–405, appellant urges that the bequests to appellees were general and not specific. Although, in the account, Ms. Dolly took the position that the bequest was a specific legacy and that the additional shares passed to the legatees under § 4–405, she later altered that view and now agrees that the bequests were not specific and that § 4–405 is inapplicable. Appellees now contend that the bequests were demonstrative but that they nonetheless are entitled to the additional shares.

We agree with all parties that the legacies were not specific; we agree with appellees that they were demonstra-

---

1. That statute was enacted in 1969 to reverse a contrary ruling announced in *Hicks v. Kerr,* 132 Md. 693, 104 A. 426 (1918).

tive, and we agree further that they are entitled to the additional shares reflected in the account.

There are two old Maryland cases that bear on whether a gift of stock, as expressed in Ms. Stegmaier's Will, is specific or demonstrative. In *Dryden, supra,* 49 Md. 356, there was a bequest of "$8000 in State of Missouri Bonds." Among the testator's property were eight $1,000 State of Missouri bonds. The question was whether the legatee was entitled to interest received on the bonds accruing after the testator's death; under the law prevailing at the time, she would be entitled to such interest only if the bequest was specific. Applying the rule of construction noted above, the Court held that the bequest was a general one. At 365, it held that

> "in a bequest generally of stocks, or a sum of money in stocks, without further explanation, and without more particularly referring to or marking the *corpus* of the identical stock, the fact that the testator possessed such stock at the time of the execution of the will is not sufficient to justify the court in declaring the legacy to be specific."

In *Kunkel, supra,* 56 Md. 120, the testator made a number of bequests of corporate bonds and stock, sometimes referring to them as "my" bonds or stock. One of those bequests was of "$5000 of the Wilmington, Columbia & Augusta Railroad Bonds." The testator had five bonds of that railroad, each with a face value of $1,000 and a market value of $300. The question was whether the bequest was of the particular bonds (a specific bequest) or of $5,000 (a general bequest). Relying, in part, on the adjective "my," the Court held that the bequest was specific; the legatee got the actual bonds, not $5,000.

If we had to rely on just those cases, we would conclude that the gifts here were more like that in *Dryden* than those in *Kunkel.* But we do not believe that the result should be dictated by whether the legacies were specific or demonstrative.

There is an excellent analysis of the issue in a 1972 A.L.R. Annotation. J. Kemper, *Change In Stock Or Corporate Structure, Or Split Or Substitution Of Stock Of Corporation, As*

*Affecting Bequest Of Stock,* 46 A.L.R.3d 7, 13 (1972). Mr. Kemper there notes that, although in many cases the effect of a stock split is negligible in that, after the split, the owners have the same proportional interest they had before, such splits may have an effect on the market value of the shares. In either case, he says,

> "it is not surprising that in the great majority of cases the courts have, upon one theory or another, arrived at the conclusion that the additional shares received by a testator as a result of a stock split occurring after he had executed his will should go to the named legatee of a bequest of a number of the original shares in order to give to such legatee, as nearly as possible, what the testator seemingly intended for him or her to have when he made his gift of the original shares."

The author points out that, in a number of cases, the courts have reached this result by labeling the gift a specific bequest, but that in other cases the courts have reached the same result by finding a general intent on the part of the testator to have the additional shares so distributed. In those cases, he posits,

> "[the] courts were concerned in large measure with preventing the harsh and frequently unrealistic results which, in many instances, would have come about had the named legatee of the bequest of the original shares been awarded only those shares, and had the additional (split) shares been given to some other person, quite often [as here] a residuary legatee, to whom the testator had not seen fit to give any original shares directly, or to whom such testator had given some original shares but only as a part of residue which he did not dispose of particularly."

*Id.* at 13–14.

This analysis is supported by *Bostwick v. Hurstel,* 364 Mass. 282, 304 N.E.2d 186 (1973); *Rosenfeld v. Frank,* 208 Conn. 562, 546 A.2d 236 (1988); and *Stickley v. Carmichael,* 850 S.W.2d 127 (Tenn.1992); *cf.* as well *In re Estate of Howard,* 393 So.2d 81 (Fla.App.1981). Page, *The Law of Wills* reaches

the same conclusion. At § 33.35, it states that "[a] general bequest of a specific number of shares of stock in a corporation to a legatee has been construed as entitling the legatee to an increased number of shares to compensate for the decrease in market value per share by a stock split." *See also* 61 Op.Att'y Gen. 886, 889–90 (1976), adopting that view with respect to post-death stock splits.

We believe that this is a more appropriate analysis than having to risk the impetus to declare what would ordinarily be regarded as a demonstrative legacy as specific in order to achieve a proper result. The Maryland case law, cited above, makes clear that, in all cases, it is the testator's intent that governs and that the rules of construction are simply guides to ascertaining that intent.

██ Ms. Stegmaier was no mere passive investor in First Financial Corporation; she was a retired employee of that company and served on its Board of Directors, both when she drew her Will and when she died. When she signed the Will in April, 1993, she knew that (1) she was bequeathing more shares than she then owned, but (2) she or her personal representative could easily make up the shortfall by exercising the options that she had. Although the record does not so indicate expressly, there is a fair inference that, when she died, she must have known of the impending stock split, as it was distributed only 11 days after her death to holders of record on November 10, 1993—nine days before her death.

Also significant is the fact that there was no bequest of any of the stock to the residuary, or to appellant by name. The only mention of the stock was in the bequests to the three named individuals. Those bequests were described as simply a number of shares; there was nothing to indicate that any of the three legatees was to receive a specific stock certificate or was otherwise to be limited, in the event of a stock split occurring after her death, to the original number of shares mentioned. In short, the evidence supports a conclusion that she intended for Ms. Diaz, Ms. Dolly, and Ms. Nies to have a proportional share of her holdings and not be limited to a

particular number of shares. We agree with the Orphans' Court, therefore, that those legatees were entitled to the benefit of the three-for-two split.

### (3) The Options

■ For essentially the same reasons, we conclude that it was appropriate for the personal representative to exercise the options, at least those proportional to the total number of shares distributed to Ms. Diaz, Ms. Dolly, and Ms. Nies. As to the remaining 1,501 options, appellant has failed to show how she was harmed.

Again, this is ultimately a question of Ms. Stegmaier's intent. When she signed the Will in April, she must have known that the most practical way in which her bequests to Ms. Diaz, Ms. Dolly, and Ms. Nies could be fully implemented was to exercise at least 1,069 of the options. It would have made no sense for her to make bequests that she knew could not be carried out as she specified. That, of course, militates against a view that she intended all of the options either to expire or to become part of the residuary estate. Indeed, as we have concluded that the bequests were demonstrative rather than specific, the general assets of the estate would be charged with making up the deficiency in any event, and the most economical way of doing that was to exercise the options.

The stock split did not solve the problem; indeed, it exacerbated the problem. Although it supplied the shares necessary to make up the deficiency in the 3,450 initially bequeathed, as we have held, the three legatees were entitled to their proportional shares acquired through that split. That required a distribution of 5,175 shares (3,000 for Ms. Diaz, 1,500 for Ms. Dolly, and 675 for Ms. Nies). The stock split produced only 3,571 shares, however, leaving a deficiency of 1,604 shares. Those additional shares would have to be acquired either through market purchases or through the exercise of options. The balance of 1,501 shares acquired through the options went to appellant. At the closing price of 27⅝, it appears that she received $41,465 worth of stock at a cost of $10,011 (1,501

shares × \$6.67 option price).  We fail to see why she would complain about that.

JUDGMENT AFFIRMED;  APPELLANT TO PAY THE COSTS.